HUNTER, JR., ROBERT N., Judge.
Respondent-mother appeals from an order terminating her parental rights in her son "Ben"[1] and from the earlier permanency planning order in which the trial court eliminated reunification from Ben's permanent placement plan. See N.C. Gen. Stat. § 7B-1001(a)(5)(a), (6) (2017). We affirm.
I. Factual and Procedural Background
On 2 June 2016, the Pitt County Department of Social Services ("DSS") obtained non-secure custody of two-week-old Ben and filed a juvenile petition alleging he was neglected. After a hearing on 20 October 2016, the trial court adjudicated Ben a neglected juvenile by order entered 9 November 2016. The court made the following findings in support of the adjudication:
5. The Respondent Mother is low functioning and has short term memory loss as a result of a traumatic brain injury. She is on disability.
6. At the filing of the petition, the Respondent Mother resided in the home of her sister, brother-in-law and their three children. The home was found ... to be filthy with cribs and beds covered in food and soiled diapers on the floor. The Department Social Worker also observed dirty condoms lying about and syringes exposed and accessible to the children in the home.
7. The Respondent Mother has a history of sexually abusing a minor child, including a minor brother when she was 18 years old.
8. The Respondent Mother was a victim of sexual abuse herself by her father.
9. The Respondent Mother has two older children that are not in her custody.
10. The Respondent Mother does not know how to prepare bottles for the Juvenile or to meet the Juvenile's basic needs.
Respondent-mother stipulated in open court to these facts and to the existence of a factual basis for Ben's neglected status.
At disposition, the trial court found that Ben tested positive for marijuana at birth, and that Respondent-mother acknowledged a history of "marijuana and alcohol use" as well as untreated mental health diagnoses including "post-traumatic stress disorder, seizures, and obsessive compulsive disorder." Respondent-mother was currently living in a hotel and planned "to reside with strangers for 'a couple of days at a time' " after being asked to leave her sister's home.
The trial court found that Respondent-mother had two older children who were the product of incest with her father. One of these children had been adopted, and the second was "placed in a guardianship arrangement." At the time of the 20 October 2016 hearing, Respondent-mother had married "Mr. C.," who had "an extensive history of domestic violence." Although Mr. C. had claimed paternity of Ben, subsequent genetic testing revealed he was not the child's father. Respondent-mother then identified Ben's father as "Mr. D.," a man who had raped her. Respondent-mother had no contact information for Mr. D., who reportedly lived in New Hampshire.
The trial court also noted the results of a psychological evaluation obtained by Respondent-mother at Carolina Care and Counseling on 11 August 2016. The evaluator concluded that Respondent-mother "should not be expected to parent independently" due to her cognitive limitations.
Based on these dispositional findings, the trial court maintained Ben in DSS custody and ordered Respondent-mother to follow the recommendations of her psychological evaluation; to submit to a mental health evaluation and comply with any recommended treatment; to take all medications as prescribed; to complete a parenting class; to maintain contact with DSS; to submit to random drug screens; and to obtain safe, stable housing. The court granted Respondent-mother two supervised visits with Ben per month.
After a review hearing on 12 January 2017, the trial court scheduled the initial permanency planning hearing for 27 April 2017. On 27 April 2017, the court continued the permanency planning hearing to 29 June 2017 with the consent of the parties. The parties consented to a second continuance of the hearing until 31 August 2017, in order to secure the attendance of witnesses.
At the 31 August 2017 permanency planning hearing, the trial court determined that further efforts to reunify Ben with Respondent-mother or his father "would be clearly unsuccessful or ... inconsistent with the Juvenile's health and safety." In its order entered 25 September 2017, the court established a primary permanent plan for Ben of adoption with a secondary plan of guardianship with a court-approved caretaker.
Respondent-mother filed timely notice preserving her right to appeal from the permanency planning order. See N.C. Gen. Stat. § 7B-1001(b) (2017). The trial court held a subsequent permanency planning hearing on 30 November 2017 and maintained the primary and secondary plans established at the initial hearing.
DSS filed a petition to terminate Respondent-mother's parental rights on 18 December 2017. After a hearing on 24 May 2018, the trial court entered an "Adjudication Order on Termination of Parental Rights," on 14 June 2018, finding grounds to terminate Respondent-mother's parental rights for neglect and dependency under N.C. Gen. Stat. § 7B-1111(a)(1) and (6) (2017). By separate "Order Regarding Best Interest of Juvenile on Termination of Parental Rights," the court concluded that terminating Respondent-mother's parental rights is in Ben's best interest.[2] Respondent-mother filed timely notice of appeal from the termination orders and from the 25 September 2017 order eliminating reunification from the permanent plan.
II. Standard of Review
"Appellate review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and the findings support the conclusions of law." In re J.C.S. , 164 N.C. App. 96, 106, 595 S.E.2d 155, 161 (2004) ; see also In re Weiler , 158 N.C. App. 473, 477, 581 S.E.2d 134, 137 (2003). Our Supreme Court has held that incomplete findings of fact in a permanency planning order "may be cured by findings of fact in the termination order" when both orders are appealed and considered together. In re L.M.T. , 367 N.C. 165, 170, 752 S.E.2d 453, 457 (2013). The trial court's selection of an appropriate disposition based on its assessment of a juvenile's best interests is reviewed only for abuse of discretion. In re J.W. , 241 N.C. App. 44, 52, 772 S.E.2d 249, 255, disc. review denied , 368 N.C. 290, 776 S.E.2d 202 (2015) ; In re D.S.A. , 181 N.C. App. 715, 720, 641 S.E.2d 18, 22 (2007).
III. Analysis
Respondent-mother now claims the trial court erred in eliminating reunification from Ben's permanent plan and establishing a permanent plan of adoption or guardianship without "first consider[ing] whether a relative is willing and able to provide proper care and supervision of Ben in a safe home" as provided in N.C. Gen. Stat. § 7B-903(a1) (2017). Noting that subsection 7B-903(a1) establishes a preference for relative placements whenever a juvenile is removed from the home, Respondent-mother contends the court should have considered her mother-in-law, "Ms. H.," as a placement option for Ben at the 31 August 2017 permanency planning hearing.[3]
Subsection 7B-903(a1) applies at the initial dispositional hearing and all subsequent review and permanency planning hearings and provides as follows:
In placing a juvenile in out-of-home care under this section, the court shall first consider whether a relative of the juvenile is willing and able to provide proper care and supervision of the juvenile in a safe home. If the court finds that the relative is willing and able to provide proper care and supervision in a safe home, then the court shall order placement of the juvenile with the relative unless the court finds that the placement is contrary to the best interests of the juvenile.
N.C. Gen. Stat. § 7B-903(a1) ; In re L.L. , 172 N.C. App. 689, 704, 616 S.E.2d 392, 401 (2005) ; see also N.C. Gen. Stat. § 7B-505(b) (2017) (creating relative placement preference for periods of nonsecure custody prior to adjudication).
Under N.C. Gen. Stat. § 7B-903(a1), the trial court must give priority to an available relative whenever it places a juvenile in "out-of-home care," including periods in which the juvenile is in the custody of the local department of social services pursuant to N.C. Gen. Stat. § 7B-903(a)(6) (2017). The "relative placement preference" thus applies to any permanent custodial arrangement ordered by the court in an abuse, neglect, or dependency proceeding-such as guardianship under N.C. Gen. Stat. § 7B-903(a)(5) (2017)-and to any temporary out-of-home placements during the pendency of the case following an adjudication of abuse, neglect, or dependency. It does not apply at the dispositional stage of a termination of parental rights proceeding. See N.C. Gen. Stat. § 7B-1110(a) (2017) ("After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest."); see also N.C. Gen. Stat. § 7B-908(d1) (2017).
As an initial matter, we note the trial court's alleged failure to consider Ms. H. as a placement for Ben at the initial permanency planning hearing appears to be unrelated to its decision to eliminate the goal of reunification from Ben's permanent plan. See N.C. Gen. Stat. § 7B-906.1(d) - (e) (2017) (prescribing factors to be considered in creating the permanent plan). The permanent plan adopted by the court-adoption or guardianship with a court-approved caretaker-did not exclude Ms. H. as a placement option. Cf. In re D.S. , --- N.C. App. ----, ----, 817 S.E.2d 901, 904 (2018) (reviewing trial court's non-compliance with N.C. Gen. Stat. § 7B-903(a1) when the court changed the child's permanent plan to guardianship and appointed a non-relative as guardian without considering the grandmother as a placement). Moreover, the trial court's placement decision in the initial permanency planning order was effective only until the next permanency planning hearing on 30 November 2017.
Under N.C. Gen. Stat. § 7B-903(a1), the trial court must first "determine whether the relative in question is willing and able to provide proper care and supervision in a safe home" before assessing whether the relative placement is contrary to the juvenile's best interest. In re T.H. , 232 N.C. App. 16, 29, 753 S.E.2d 207, 216 (2014). If the relative is found to be an appropriate caretaker, the court's "[f]ailure to make specific findings of fact explaining [that] the placement with the relative is not in the juvenile's best interest will result in remand." In re A.S. , 203 N.C. App. 140, 141-42, 693 S.E.2d 659, 660 (2010) (citing In re L.L. , 172 N.C. App. at 704, 616 S.E.2d at 401 ).
The record shows the trial court was not alerted to Ms. H. as a possible placement for Ben prior to the 31 August 2017 permanency planning hearing. At the 90-day review hearing on 12 January 2017, Respondent-mother asked only that Ms. H. be allowed to supervise her visitations with Ben. The court found that Ms. H. "has never met the Juvenile or made contact with [DSS]" but ordered DSS to "contact [Ms. H.] regarding her interest in assisting with supervised visits so that she may be assessed for appropriateness."
In its written report for the 31 August 2017 permanency planning hearing, DSS first advised the court that Respondent-mother "would like the Department to explore her mother-in-law, [Ms.] H., as a potential candidate" for guardianship. The report described Ms. H. as "condescending and authoritative towards" Respondent-mother during visitations. An addendum to the report prepared by DSS on 20 June 2017 advised the court as follows:
At every visit, Social Worker Owen usually asks [Respondent-mother] about [Ms. H.], her mother-in-law. Social Worker is aware that Ms. [H.] is going through some medical issues, as she has not attend[ed] recent visits. During the past three visits, [Respondent-mother] has stated that her mother-in-law treats her like a child. [Respondent-mother] was referring to several comments that Ms. [H.] made to her regarding the pictures and drawings [Respondent-mother] has on her walls in her apartment. During the May 15, 2017 visit, she referred to Ms. [H.] as a "total bitch". The Department continues to have concerns surrounding Ms. [H.] and [Respondent-mother's] relationship; therefore, Ms. [H.] has not been screened or implemented as a monitor for the supervised visits.
In the initial permanency planning order, the trial court made the following findings of fact:
28. The Respondent Mother requires support to parent the Juvenile as she cannot make complex decisions independently. As a result [she] requires supports that will be available to her for an indefinite period of time.
29. The Respondent Mother has proposed both her husband and her mother-in-law as her long term supports. The Respondent Mother's relationship with both these individuals is volatile.
30. In April 2013, the Respondent Mother accused her husband of rape and assault. As a result her husband was arrested. The Respondent Mother later acknowledged this was a false accusation. In April of 2017, the Respondent Mother was communicating weekly with an ex-boyfriend and in May 2017 was having sex with someone else she met on Craig's list. The incidents do not create a stable marital environment ....
31. Additionally, in May of 2017 the Respondent Mother was referring to her mother-in-law as a "bitch." This likewise does not convince the Court that the Respondent's mother-in-law is in a position to be a long term support.
The court did not expressly address Ms. H.'s suitability as a placement for Ben and continued DSS's custody and placement authority over the child. Ben remained with his foster parents, where he had resided since 28 July 2016.
DSS completed a home study on Ms. H.'s residence on 10 January 2018 but did not recommend her as a placement for Ben. DSS did approve Ms. H. as a visitation monitor for Respondent-mother.
In its "Adjudication Order on Termination of Parental Rights," the trial court made the additional findings of fact regarding Ms. H.:
17. ...
m. The Respondent Mother has requested that the Department consider placing the Juvenile with her mother-in-law, [Ms. H.]. The Respondent Mother and Ms. [H.] do not have a positive relationship.
....
43. [Ms. H.] ... will be 69 years old next month. She works 30 hours a week with a disabled grandson. Ms. [H.] is not a long term solution for the Juvenile's care needs based on the Juvenile's age.
44. [Ms. H.] has unrealistic expectations for a two year old. It is unreasonable to believe that a two year old will ask before touching an item in the home. It is also unreasonable to believe that a two year old will stand with his nose on the wall as a form of discipline.
45....
....
b. ... Respondent Mother remains unable to care for the Juvenile and has not named an appropriate alternative placement ....
We conclude the termination order's findings are sufficient to cure the inadequate findings in the 25 September 2017 permanency planning order as contemplated by In re L.M.T. , 367 N.C. at 170, 752 S.E.2d at 457. The quoted findings demonstrate the court's consideration of Ms. H. as a potential placement for Ben, as required by N.C. Gen. Stat. § 7B-903(a1). See generally id. at 168, 752 at 455 ("The trial court's written findings must address the statute's concerns, but need not quote its exact language."). Because the court determined that Ms. H. is unable to provide proper care for Ben, it was not required to separately consider whether such a placement would be contrary to his best interests. In re T.H. , 232 N.C. App. at 29, 753 S.E.2d at 216 ("[B]efore determining whether relative or non-relative placement is in the best interest of the juvenile, the statute first requires the trial court to determine whether the relative in question is willing and able to provide proper care and supervision in a safe home.").
Respondent-mother does not challenge the evidence supporting the trial court's individual evidentiary findings about Ms. H.-specifically, Finding 31 in the permanency planning order and Findings 43 and 44 in the termination order. See generally Koufman v. Koufman , 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal."). Rather, she contends the evidence does not support the court's determination in Finding 45-whether construed as a finding of fact or a conclusion of law-that Ms. H. is unable to provide proper care and supervision for Ben.
We view the trial court's determination that a particular caretaker is unable to provide appropriate care and supervision for a child as dispositional in nature and, therefore, reviewed for abuse of discretion. See In re T.H. , 232 N.C. App. at 29, 753 S.E.2d at 216. " 'An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision.' " In re B.W. , 190 N.C. App. 328, 336, 665 S.E.2d 462, 467 (2008) (quoting In re Robinson , 151 N.C. App. 733, 737, 567 S.E.2d 227, 229 (2002) ).
The evidence and the trial court's findings support its determination that Ms. H. is unable to provide proper care and supervision for Ben. As found by the court, Ms. H. testified that she is the full-time caretaker of her adult grandson, who is autistic. She also works thirty hours per week teaching her grandson life skills.
The DSS social worker, Ms. Owens, testified that Ms. H.'s home study had not recommended her as a placement for Ben. Ms. Owens offered the following summary of DSS's concerns:
[Ms. H.] will be turning 69 in June and this age is concerning because [Ben] is 20 months old and very active.
Ms. [H.]'s health is questionable. She's a ten-year survivor of kidney cancer and in January of 2017 was diagnosed with breast cancer. The Department is concerned of her ability to care [for] a toddler while undergoing medical issues.
Her grandson although high functioning has been diagnosed with Asperger's. Several references have made comments that he can be [a] handful, can be difficult, and at times very moody. The Department is concerned how the grandson will act towards [Ben]'s childlike impulsiveness and playfulness.[4 ]
....
The Department is concerned about Ms. [H.]'s lack of support. Although she has friends and church family, [she] does not have any support to help with caring for [Ben] while she's doing errands. She has made several comments that she would just take him wherever she went. The Department was concerned that she should ever leave [Ben] in the care of the grandson.
Ms. [H.] has unrealistic expectations regarding parenting. She reported with her own children she put a circle in the wall, put their nose in the circle, and interlock their fingers behind their back to stand in a dislocated [sic] amount of time. ...
The unrealistic part comes from the interaction of the breakables located through the entire house. She reported that [Ben] would have to ask to touch anything that belongs to her or the grandson, look at them gently, and put them back. Ms. [H.] stated that it worked for her children and grandchildren and it would work for [Ben].
Several times during the interview Ms. [H.] seemed to be frustrated that she had to repeat information to the social worker. The social worker wondered if she would have patience for a toddler that was learning to talk and needed to have many words and requests repeated to him.
Furthermore, Ms. H. had advised DSS that, if she was unable to manage Ben, she would return the child to Respondent-mother and Mr. C.
Ms. H. testified she had raised two children of her own, had a degree in social work, and had worked for two years as "a mental health counselor in a men's prison" in Tennessee. She described herself as "too busy for [her] age to catch up with [her]" and as ready and willing to take care of Ben. She affirmed her breast cancer is in remission, and she suffers no ill effects from the "chemo pill" she takes as treatment.
Ms. H. further averred she had "very close" friends who could "help out" if she needed someone to watch Ben. She disputed Ms. Owens' testimony about her expectations for Ben and her disciplinary techniques. Asked specifically about the many "breakables" in her home, she replied as follows:
Well, first of all, if they were within a two-year old's reach, they would be put away.
And second of all, if he really wanted to see something that was breakable, I'm confident that [Ben] would say see, see, and point to the object and I would take the object down and say okay, we have to be careful. Here you can look at it and I would hold my hands underneath his just in case he, you know, accidentally dropped I would be able to catch.
"When the trial court is the trier of fact, the court is empowered to assign weight to the evidence presented at the trial as it deems appropriate." In re Oghenekevebe , 123 N.C. App. 434, 439, 473 S.E.2d 393, 397 (1996). In this role, the court resolves material conflicts in the evidence and adjudges the credibility of each witness. In re Gleisner , 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000) ; Oghenekevebe , 123 N.C. App. at 440, 473 S.E.2d at 398. Furthermore, "[i]f different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected." Gleisner , 141 N.C. App. at 480, 539 S.E.2d at 365-66.
We decline to second-guess the trial court's determination that Ms. H.'s age, health history, home environment, and current caretaking responsibilities make her unable to serve as a permanent placement for twenty-month-old Ben. Respondent-mother's argument effectively asks this Court to re-weigh the evidence and draw inferences more favorable to her regarding Ms. H.'s suitability as a placement under N.C. Gen. Stat. § 7B-903(a1). Such an exercise is beyond the purview of an appellate court.
IV. Conclusion
Based on the evidence and the uncontested findings, we hold the trial court did not abuse its discretion in assessing that Ms. H. is unable to provide proper care and supervision for Ben. Its orders are hereby affirmed.
AFFIRMED.
Report per Rule 30(e).
Chief Judge MCGEE and Judge MURPHY concur.

A pseudonym.

The court also terminated the parental rights of Ben's father.

Both DSS and the Guardian Ad Litem posit that Ms. H. does not qualify as Ben's "relative" for purposes of N.C. Gen. Stat. § 7B-903(a1), inasmuch as her son, Mr. C., is not Ben's biological father. The Juvenile Code does not define the term "relative" for purposes of the statutory placement preference. In general, "[a] 'relative' has been defined as a 'person connected with another by blood or affinity ; a person who is kin with another.' " Yurek v. Shaffer , 198 N.C. App. 67, 77, 678 S.E.2d 738, 745 (2009) (emphasis added) (quoting Black's Law Dictionary 1315 (7th ed. 2004)). We are satisfied Respondent-mother's marriage to Ms. H.'s son established a familial relationship between Ms. H. and Ben.

Ms. Owen noted that Ms. H.'s grandson and Ben had never met.